Amado B. Colón, Plaintiff and Appellee, *v.* The Shell Co. (P.R.) Ltd., Plazuela Sugar Co., Inc. and Manuel Sierra, Defendants and Appellants.

Nos. 7884, 7720 and 7721. Argued April 12, 1939.—Decided November 15, 1939.

576

*Jaime Sifre, Jr., Horacio Franceschi* and *Rafael Pastor,* for The Shell Co.; *Orlando J. Antonsanti,* for Plazuela Sugar Co.; *Antonio J. Matta,* for Mr. Sierra; *Susoni, Defendini & Arrache Battistini,* for Mr. Colón.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

This suit was filed for the recovery of the damages which the plaintiff alleged were caused by the negligent acts of the defendants. The essential averments of the complaint may be condensed as follows:

That the complainant is the co-owner of certain lands and the lessee of other situated in the Ward Tanamá of Arecibo. That he uses these lands for the planting of sugar cane and raising livestock and for other agricultural purposes. Besides the aforesaid activities, the complainant, on the date stated in the complaint, towards the end of February, 1930, as well as on the date of the filing of said complaint, had a contract with the Municipality of Arecibo by virtue of which he was bound to collect, carry away and cremate the garbage of the city.

That the defendant, Plazuela Sugar Co., Inc., on the aforesaid dates was in the business of grinding cane in its factory named "Central Los Caños" situated in Arecibo. That through the lands where said central is situated there is a river which has a small bed and a slow current called Santiago and which later passes through the lands of the complainant.

That the other defendant, The Shell Co. (P.R.) Ltd., on the aforesaid dates was a foreign corporation doing business in Puerto Rico and supplying the codefendant, Plazuela Sugar Co. with fuel oil which was brought to the Central

Los Caños on the railroad, in tank wagons belonging to the vendor. It was there placed on tracks near the factory and also near the River Santiago and from these tank wagons the employees of the factory, by means of a pump, transferred it to their deposits. That on or about the latter part of February or the first days of March, 1930, the defendant, Manuel Sierra, employee of the Plazuela Sugar Co., was receiving fuel oil and transferring it to the deposits of the factory, assuming the control and vigilance of the tank wagons of fuel oil once delivered by the vendor.

On the aforesaid date, the fuel oil in one or various of said tank wagons spilt from its container, impregnating and saturating the land between the tank wagon and the River Santiago with fuel oil. The oil reached the water of the river and carried by the current was taken to the lands of the complainant and from there continued its course. That in these waters so contaminated the cattle of the complainant drank, became sick and the great majority died, although steps were taken to avoid it. That the sick cattle which did not die, had to be given medicines and special care which caused the complainant expenses, bother and sleepless nights. The cattle lost in weight, was stunted in its growth and was left weak and sickly and did not develop as it would have done had it not been for said intoxication. That part of that cattle were oxen that the complainant used to prepare his lands for planting cane and in other work and the complainant was obliged to suspend the delivery of cane to the factory and he was not able to plant a hundred *cuerdas* of cane as he had agreed with the Central Cambalache and thereby suffered damages in his agricultural business and his credit was seriously affected. That as the complainant had no cash on hand and as his credit had been affected on the date of the filing of the complaint, he had not been able to get oxen to carry out his business and for not being able to cultivate and plant his lands he was deprived of the reasonable profits from the crops of said lands. The complainant

then alleges on information and belief that the death of his cattle was due to the negligence of the defendant consisting in: putting the fuel oil in defective containers without taking precautions to avoid the spilling of said fuel oil; in situating the fuel oil near the Santiago River, since they knew or should have known that if said fuel oil should spill it would reach and be carried away by the river and cause other people damages; and in not taking any precautions to avoid this acting on the assumption that said substance was not noxious.

The damages which the complainant alleges that he suffered are set out in the following items:

| | |
|---|---:|
| For dead cattle | $15, 750. 99 |
| For delay in the development of the sick cattle which survived | 478. 83 |
| For hiring of oxen for work in the collection of the crop | 648. 00 |
| Expenses for the care of the cattle | 200. 00 |
| Other losses and delays in his business and injury to his credit | 8, 000. 00 |
| Total | $25, 076. 00 |

The complaint ends with the prayer that the judgment order the defendants jointly to pay the complainant the total amount of the damages plus costs, expenses and attorney's fees and any other remedy consistent with the allegations.

The three defendants answered jointly and filed one answer in which they denied the essential allegations of the complaint because they lacked sufficient information and belief. The defendant, Shell Co., (P.R.) Ltd., denied that it was a foreign corporation and alleged on the contrary that it was a limited partnership organized under the laws of England. The answer then prays that the complainant be ordered to pay costs, expenses and attorney's fees.

After they had filed their answer, the defendants requested and obtained a ruling ordering the complainant to file a bill of particulars.

In compliance with said order of the court, plaintiff filed a bill of particulars, the essentials of which are as follows:

1. It is stated that the properties to which the complaint refers are situated, one in the wards Hato Abajo and Hato Arriba, and the rest in the same ward Hato Abajo, of Arecibo.

2. The situation of the place where the watering trough of the cattle was located is specified.

3. Is is stated that eighty-six heads of bovine livestock and seven heads of equine livestock died and that the sick livestock which did not die, consisted of twenty-four heads of bovine livestock.

4. It is stated that the special care which the sick livestock was given consisted in cutting and feeding grass and in the administration of the following medicines: bitter earth, cream of bismuth, sodium sulphate, eggs in black coffee, rum, barley and flax seeds and olive oil.

5. It is stated that in the case of the stock no veterinary was employed, the only use of a veterinary being to prescribe the treatment.

6. It is stated that thirty-five draw oxen died.

7. It is stated that fuel oil is noxious or dangerous to persons or animals in the following manner: because it inflames the digestive tube, stomach and the intestines causing an acute or chronic poison.

8. It is stated that the person to whom the complainant paid $648.00 for the hiring of oxen for collecting the crop was Miguel Correa.

After hearing the evidence submitted by the parties which consists of 1,100 typewritten pages, the lower court rendered judgment on May 5, 1937, ordering the defendants to pay jointly to the complainant the amount of $3,000, plus the costs but not including attorney's fees.

Both parties filed an appeal.

The complainant alleges that the lower court committed three errors:

"1. The court erred in holding that it was not just that the complainant recover the cost of the hire of the oxen for the collection of his crop.

"2. The lower court committed gross, manifest and clear error and was moved by bias, prejudice and partiality in assessing at $3,000 the damages that the defendants should pay to the plaintiff.

"3. The court erred in holding that the defendants had not been obstinate to such an extreme as to justify an award of attorney's fees."

The defendants based their appeal on seven errors which they alleged the lower court committed as follows:

"1. The lower court committed a fundamental error of law in rendering judgment on the complaint and basing the same on a fact which was not in issue.

"2. The lower court committed an error of fact and of law in holding that the defendants were negligent and that from said negligence damage resulted to the property of the complainant.

"3. The lower court erred in admitting evidence in regard to lands possessed by complainant as co-owner or lessee in the Wards of Hato Abajo and Hato Arriba and in dismissing the motion of the defendants requesting the striking out of said evidence.

"4. The court erred in dismissing the motion for non-suit of the defendants.

"5. That the evidence brought by the complainant in regard to the last essential fact to establish the cause which caused the damages alleged in the complaint is nothing but a conjecture or possibility and **does not have the characteristic** of a proven probability., And that the lower court committed an error of fact and of law in giving judgment on the complaint because the judgment so rendered is based, as to said ultimate fact, on a mere conjecture or possibility.

"6. The judgment rendered by the lower court is against the law and is not upheld by the evidence in regard to the defendant, Manuel Sierra.

"7. The lower court erred in rendering judgment on the complaint in this case and in assessing the damages which the defendants should pay to plaintiff in $3,000."

The complainant adopted the statement of the case to bring the evidence before this Court. The defendants did so by the transcript of the evidence.

The defendants appealed from the decision of the lower court which approved the statement of the case submitted by the complainant but on the date set for the hearing it was stipulated by both parties with the approval of this Court that both appeals should be decided by the use exclusively of the transcript of the evidence brought by the

defendants and therefore, the appeal filed against the decision approving the bill of exceptions and statement of the case prepared by the complainant is academic.

Said appeal should therefore be dismissed as academic.

If the errors alleged by the defendants existed, the complaint should be dismissed and in such case, it would be unnecessary to consider the errors alleged by the complainant, since his appeal is directed exclusively to increase the amount of the judgment and that a judgment for attorney's fees be given.

First, however, it is necessary to make an analysis of the evidence to be able to determine if the defendants are legally liable for the damages which the plaintiff alleges he sustained.

According to the evidence of the plaintiff, about the latter part of February or the first days of March and previous to the said dates, he was in possession of several farms in Arecibo, one as owner and the other as lessee. Some of these farms he used to plant sugar cane which he ground at the Central Cambalache. One of these farms which bounded with the River Santiago he used as pasture and kept there the oxen which he used in farming. He also kept there some other bovine livestock and some racing mares and their offspring and a racing stallion called Marqués de la Plata. All his livestock was loose and as the part of the farm that was not fenced bounded on the river, when the livestock was thirsty, they went to the river and drank. One morning, towards the end of February or the beginning of March, 1930, the complainant was informed by a foreman, that he had not been able to harness the oxen for the day's work because they were sick, that they were laying down in the pasture and did not get up. Immediately the complainant went from his house to the place where the livestock was, he examined it and observed that the livestock's muzzles were black and that they had diarrhea. (T. of E. 47.) He then went to the river and found a black substance on the water

which he touched and which smelled to him of fuel oil, the waters were decomposed and stenched due to the fishes, crabs, eels and shrimps which were dead. He then ordered the livestock to be changed to another of his properties near his dwelling and ordered that they be put in the shade. He then went to the Central Los Caños in his automobile. In the central he saw a large tank of fuel oil situated about three or four meters from the rivulet which flowed into the River Santiago. The land near the tank was completely impregnated by fuel oil which ran down the rivulet and from there passed to the river. In the central he asked for Mr. Fraticelli, its manager, but was told that he was in vacation and that Mr. Loveday was taking his place. The latter was arguing heatedly with Mr. Gómez, agent of The Shell Co. in Arecibo, about the spilled fuel oil. He told the manager of the central and Mr. Gómez, of the damage that had been done to his livestock by the fuel oil and Gómez and the plaintiff went to see the damage which he alleged had been caused. They went to his farm but when they started to see the sick livestock and a dead ox, Gómez said that he was tired, that he was not accustomed to walking and he went back to Arecibo. The plaintiff tried to see the municipal judge. Not being able to do so, he brought the secretary of said court to observe the livestock, later accompanying him to the central to see the tank of fuel oil. He then communicated with the Department of Agriculture by telegram and sent a telegram to the veterinary of the department, Dr. Menéndez Guillot, who under order of Dr. Bagué, Assistant Commissioner of Agriculture, arrived at the farm of the plaintiff March 6, 1930. Dr. Menéndez testified that in a shelter near the house, he saw six oxen and two horses. On examining them he saw one of the animals was dead and the others, although they were standing up, looked as though they had colic pains. They pawed the ground with their front legs, they laid down and then stood up and had a profuse diarrhea although not bloody. Around the mouth and

the legs and the jaws of the animals he noticed spots of black oil which made him think that the cause of the sickness was having drank that substance although there was no immersion tank around there and the symptoms which the animals presented were not those of poisoning with arsenic. He asked if the animals had been bathed with an arsenic solution and he was told that they had not been so bathed. He eliminated the diagnosis of anthrax because the symptoms which the livestock showed were not of that sickness. He prescribed then and after explaining the manner of applying the treatment he left for San Juan.

The complainant and those of his witnesses who saw the livestock and observed the river at the time of the events state conclusively that the waters were covered by black spots as that of oil, principally on its margins and that the plants and grass which grow on the banks were soaked with an identical substance. That small fishes, eels, crabs etc., were seen dead floating on top of the water and on the banks of the river from which water a bad odor was given off according to them because the fishes were in a state of decomposition. Even the witness Gómez Badillo, agent in Arecibo of the defendant, Shell Co. (P.R.) Ltd., a witness for defendant, admitted on cross-examination that he saw stains of fuel oil in the river, stating nevertheless, that they were small. (T. of E. 780.) The other witnesses for the complainant who saw the livestock, such as Ernesto Acevedo, Inspector of the Department of Health in Arecibo, Gumersindo Román, secretary of the municipal court, and José Colón, stated positively that the livestock had stains of fuel oil which were described by Dr. Meléndez in his testimony.

Another witness for the complainant, José Colón, who according to the testimony is not related to the other although having the same name, declares that on the same day in which the events occurred to which the complaint refers, he had some livestock on a farm by which the River Santiago passes, lower than the Central Los Caños and the

lands of the complainant. That he observed the spots of oil on the river and that his livestock drank from it and became sick presenting the same symptoms as the livestock of the complainant. That they were given a purge but he nevertheless lost four heads of cattle which were not paid by the Central Los Caños of which he is a small planter (colono) having fifteen cuerdas of sugar cane. (T. of E. 454.)

Other details of the evidence of the complainant shall be stated in discussing the different items of the damages claimed.

The testimony of Dr. Del Valle Sárraga, expert for the complainant, takes up from page 472 to page 643 of the transcript of the evidence. Summing up his long testimony, we could state it as follows:

On the 16th of April 1930, the complainant and his attorney, Mr. Arrache, visited him in his office bringing certain samples of fuel oil to be investigated. The expert refused these samples because they had been taken by the interested parties themselves and did not have the requirements of authenticity necessary to base a report on them. He instructed them to use the services of a notary who should certify to the conditions and circumstances under which samples were taken and he gave them the containers which they should use for it. On the 22nd of April 1930, he received by express a box which contained a container of about two quarts containing contaminated water and a can with about three pounds approximately of soil and leaves. The container with the water had cork stopper, sealed and stamped with the notarial stamp of Ulpiano Crespo. The can containing the soil was tied with string and waxed and sealed with the same notarial seal. The box in which the two containers came, was one of the so-called shipping boxes. It was nailed and had the name of the witness on it and was apparently in good condition, presenting no sign whatsoever. of having been opened. Before continuing, we

shall digress to state where, when and how these samples were taken as it appears from the notarial act made and offered in evidence over the opposition of the defendants. As to the admission of this document, we shall discuss later on in the body of this opinion. After having stated that the complainant asked him to certify as to the taking of the samples, the notary made the following "statement":

"On the same day (that is April 21), it being 16 o'clock or that is, four o'clock in the afternoon, I, the notary, went to the property of the Colón brothers in the place called El Tanque, Ward Hato Abajo of Arecibo, nearing (sic) the margin of the River Santiago which crosses the farm, I took a clean bottle and a new cork stopper and I filled it with approximately two quarts of turbid water from the r'ver which was impregnated with a great amount of a black thick substance which gave off a stench and which floated on the surface of the water to the banks of certain parts of the river and such sample is labeled, stoppered, waxed and sealed by me and deposited in the office of the American Express addressed to Dr. R. del Valle Sárraga, chemist, and a resident of San Juan.

"I also went to a place near the margin of the river on the property of the Central Los Caños and in a tin recipient I took approximately three pounds of black stony soil taken in the same place which is pointed out to me as the place where the contents of the tank of fuel oil was spilt and said tin receptable is also sealed and waxed by me of this date."

The expert, Dr. del Valle Sárraga, continued informing that when he received the box from the express office, he took the two containers which were waxed and sealed, he examined them carefully to determine which of the two had the oil with the least amount of it contaminated with strange matter and found that this was found better in the tin containing the soil because the water was very dirty and had sediments which indicated that the place where the water was taken was "stirred up". He noticed that the leaves which came with the earth were around the top of the tin and that one of them was quite soaked with fuel oil. He then took a steel spatula of the kind used in laboratories and tried to separate as great an amount as possible of the oil

closely adhered to the leaves. He cleaned it with petrolic ether and when this evaporated, there remained a residue of fuel oil. He made a qualitative analysis of the oil to be sure that it was fuel oil and when he became convinced that it was, he took approximately a drop and placed it on the tongue of a guinea pig. The animal immediately started to lick himself and smeared his whole mouth with it. He left it in his observation cage, gave it water and grass and in the cage he put another guinea pig to which he gave the following: the same grass that he had given the former as food, the same kind of water from the aqueduct and an amount of the residue of the "petrolic" oil alone but not fuel oil so that this guinea pig received all the elements that the other did except the fuel oil. At first nothing absolutely was noted except that the guinea pig which had been given the fuel oil was a long time without eating while the other ate and from time to time he moved his mouth as though trying to get rid of something distasteful. During the first hour, the first guinea pig ate nothing while the witness continued eating its grass. From time to time he moistened the grass of both guinea pigs. He noticed nothing strange for about three or four hours after which he observed that the guinea pig which had eaten the fuel oil in the above described manner became sad. It did not react naturally to the trials made by the observer when he wishes to see if an animal is sick and which consists of making a noise near one of the animal's ears with the fingers or slapping it or touching it with the finger tips on the spine. When he did these things to the animal under observation it did not move. It appeared to have been somnolent without showing any other symptom while the other was nervous as they always are and reacted very well to the noises which are used to see if they are in a normal condition. About six or eight hours later, the animal which had taken the fuel oil, showed a certain standing on end of its hairs which is a symptom of sickness. He did not notice anything else,

not even during the night except that the animal appeared sad and did not react to the tests. On the following day, when he caught and examined it, he noticed that it had had diarrhea. The diarrhea was not very bad as yet. Around the annus he noticed a certain humidity which the witness at first thought was urine but after observing it for a while he noticed that it had tenesmus and one of the times that it strained it emitted a small amount of liquid excrement. Several hours later but within the twenty-four hours, the picture developed with gastro intestinal phenomenons. There was no vomiting because guinea pigs do not vomit even even when they are seriously poisoned unless they have imbibed something very caustic. The diarrhea became stronger and stronger until finally a serious timpanitis was noticed. His stomach was as tense as the skin of a drum. After this, the animal laid on the side and refused to get up even when pinched with a sharp instrument and continued thus until it died. Immediately after it died and before cadaveric putrefaction set in, the witness made an autopsy which consisted, first in opening the abdomen, first cutting the skin until the peritoneum was completely exposed. The external peritonial surface showed nothing in particular. He opened it. Upon opening it, he found that all the external organs were in a normal condition, there had been no pathological change whatsoever neither in the heart, the lungs nor the liver but the intestines were affected, their volume being greatly increased and also greatly distended. Within the peritoneum there was a great deal of liquid. It was clear, the witness added, that the effect of the fuel oil caused a severe tympanitis due to the serous discharge that there was within the peritoneous cavity. He opened the intestines and saw that the food that the guinea pig had eaten before the experiment due to the increase of secretion of the intestinal juices was completely liquified. There was no discharge, no *petechiæ* nor any symptom indicating that there had been hemorrhage. In the meantime, the witness guinea

pig was completely well and showed no symptoms whatsoever of poisoning, neither from the food nor from the water with the "petrolic oil" residue. To convince himself, continues the expert, whether the substance was toxic or not, since they are substances that although not toxic may cause death, he took a sample of the water and centrifugalized it in a centrifugal laboratory machine, to separate it from the oil. When the centrifugation had separated a small amount of the oil and using the "petrolic oil" that he later evaporated, he was able to obtain some oil quite pure of its kind. He then informed the complainant, Mr. Colón, of his conclusions in regard to the death of the livestock in the following manner: the death might have been caused:

1. By the imbibing of the fuel oil which was on the surface of the river, said oil being a chemical substance of extreme viscosity to such an extent that it sticks closely to all the surface of the digestive track. It forms a layer over the delicate mucous membrane and naturally paralyzes their normal physiological functions. This strange matter closely adheres in the manner stated, and there being no defense to it in the body of the animal to remove it, determines, in hours or days—depending on the amount taken—in the first place irritation, later congestion due precisely to the tenacity with which it sticks and to the fact that it cannot be removed in any manner; then comes the natural and logical inflammation in this process and finally due to secondary infections which will cause death.

2. By the fact that as there was a layer of oil on the surface of the water, the contact and physical communication between the gases of the air and the water was completely cut off thereby retarding the absortion of the oxigen and nytrogen to the water which occurs by virtue of atmospheric pressure. When the extension of the oil is not very large, this absortion is cut off entirely and the following then occurs: That the small amount of oxigen existing dissolved in the water is consumed in the oxidation of organic matter that as detritus are being constantly mixed with the water, that very small amount of oxigen is consumed by the breathing of the fishes and then the fishes die due to asphyxia. When this has happened a few hours later the putrefaction of the protein of the dead fishes occurs which is the worst of all putrefactions because it 's the one which to the greatest extent creates enormous quantities of toxins and the

590

presence of these toxins then causes the death of other fishes, this causing as a consequence, finally, the contamination of the waters to such an extreme that the bovine or equine livestock which goes to drink that water becomes sick and dies due to that contamination.

3. The possibility of death due to the imbibing of the fuel due to the direct toxic action, and,

4. The theory that the three factors together might have determined the death of the animals which drank where there existed water contaminated with fuel oil. (T. of E. 519–523.)

Let us consider the evidence of the defendants. The defendant, The Shell Co. (P.R.) Ltd., sold fuel oil to the co-defendant, Plazuela Sugar Co. which used it as fuel oil in its factory at the Central Los Caños. The vendor sent this fuel oil in tank wagons belonging to them by rail and delivered it at the factory itself. From the records of the American Railroad Co. brought by the witness of the defendant, Angel Rivera, Manager of the office of said American Railroad Co. it appears that a shipment of fuel was received by the Central Los Caños on February 27 and another on March 7, 1930. On the 28th of February, Manuel Sierra Sánchez started to pump the fuel oil from the tank wagons of the vendor to the tank which was kept for this purpose at the factory of the Central Los Caños. When he tried to connect the wagons with the pipes of the tank of the sugar factory, the oil began to spill, coming out in a stream of a diameter of six inches and falling to the ground and from there through a ditch to the rivulet which flows into the Santiago River.

The witness of the defendant, Manuel Sierra Sánchez, who is a mechanic of the Central Los Caños, and who is in charge of emptying the tank wagons into the container of the Central Los Caños describes in the following manner how the fuel oil was spilt:

"When I went to empty this tank here in its lower part it had a nipple, a long piece of pipe. I took off a cap that had to be taken off to connect the piping that the tanks of the central have and when

I took the cap apart an interior valve that it has was open and the fuel oil sp'lt. (T. of E. 713).

The same witness testifying as to why the fuel oil does not spill when it is pumped to the container of the sugar factory, testified:

"It does not spill because it has a valve here ins'de, inside the tank it has a valve that is closed, completely closed and then once the pipe of the central is connected with that of the tank this valve is opened and then the oil may be pumped." (The witness testifies referring to a drawing of the tank wagons on the blackboard of the court). (T. of E. 715).

Further on, another witness was asked what he did when he saw that the tank was spilling. He answered:

"When I . . . to do this I have to almost get under the tank and when I took the cap off and the fuel oil started spilling I promptly got up and then I called Manuel Sierra, (Sierra Rodríguez), who came to see what I was doing and I told him: 'The fuel oil is spilling' and then he who saw it went on top of the tank and tried to close it with his hand but he could not and then I had a pipe that we use for that and I gave it to him and with that pipe that we use in pumping the oil he closed the valve." (T. of E. 716.)

The chief mechanic of the Central Los Caños, Manuel Sierra Rodríguez, explains the cause of the spilling of the fuel oil and referring to the drawing on the blackboard of the court testified:

"This nipple has a cap here and to empty the tank the cap is taken off. It has an interior valve *which was open* and when the cap is taken off the fuel oil tries to escape." (T. of E. 732) (Italics ours).

He tells us what he did to stop the spilling of the fuel oil in the following manner:

"I got on top of the tank and I tried to close the valve but I could not and then I asked him (Sierra Sánchez) for a piece of pipe that we use to level the general pipe and then I used it in the spokes of the wheels and the valve dropped." (T. of E. 729.)

According to the engineer, James Livingston, employee and witness of the defendant, The Shell Co., what happened

on the wagon tank was reported to him on February 28 and he came to examine it on the 3rd of March, 1930. This witness testified that the mechanism of the wagon tank was in perfect condition and that the fact that the oil spilt was not due to any defect whatsoever of the wagon.

We should not lose sight of the fact, however, that according to the mechanics, Sierra Rodríguez and Sierra Sánchez, who stopped the spilling of the fuel oil, the defect of the wagon consisted in that it had open the valve which should have come closed; and that when the cap which is the outlet of the fuel oil, to connect it with the piping of the sugar factory, was taken off, the fuel oil spilled because the valve was open. Everything was corrected as soon as Manuel Sierra Rodríguez was able to close it. Therefore, as the defect of February 28th was corrected, it is explicable that when the engineer, Livingston, examined the wagon on March 3, he found it in perfect condition.

The witness, Gómez Badillo, Manager of The Shell Co. in Arecibo as well as the engineer, Livingston, admit that on Monday, March 3, 1930, when they went to investigate what had happened in the wagon tank, they saw there Amado Colón, who was complaining of the damages caused to his livestock by reason of the substance spilt on the river.

According to the evidence of the defendants, the amount of fuel oil spilt was not less than one-thousand gallons. Mr. Bird, the Assistant Manager of The Shell Co. (P.R.) Ltd., stated that the wagon tanks had a capacity of 1,020 gallons and as the engineer Livingston testified that a third of the contents of the wagon tanks had spilt, we have then that the amount spilt in terms of gallons was the third of 5,020 or that is 1,673 gallons of fuel oil.

Luis García de Jesús, a witness for the defendant was an overseer in charge of the livestock of the Central Los Caños. He took care of the livestock on a farm belonging to his employer lower down on the river from the sugar factory. He testified that on that occasion he saw oil stains

on the River Santiago. That the livestock in his care drank of its waters and that nothing happened. He admitted nevertheless on cross-examination that the livestock did not drink where the oil stains were. He was not able to state that they had drank of said substance. (T. of E. 828.)

We shall now state that the River Santiago has a very slow current, is very narrow and according to the complainant, in some places is from a meter and a half to two meters wide and about one or one and one-half meters deep. (T. of E. 45.) According to the witness of the defendants, Luis García de Jesús, the minimum width of the river during the dry season is five or six feet and the shallowest part is from three to four feet deep. (T. of E. 527.) In the inspection of the place made by the court in Arecibo on January 18, 1936 (T. of E. 1099–1101), it is stated that the River Santiago is a current of water with a very small bed although somewhat deep and that where the rivulet and the River Santiago join, the river is scarcely two meters wide, is shallow and has hardly any current. That its principal tributary is the rivulet to which we have referred.

Up to here the evidence tends to show conclusively that said fuel oil sold by The Shell Co. (P.R.) Ltd. to the Plazuela Sugar Co. and delivered to the latter at the Central Los Caños in Arecibo, was spilt from one of the tanks in an amount which fluctuates between one-thousand and one-thousand six-hundred gallons approximately; that this fuel reached the waters of the Santiago River producing oil stains on the surface of the river; that several of the livestock at that time watered in the River Santiago and that coinciding with the escape of the fuel oil a considerable number of said livestock became sick and showed fuel oil stains on their muzzles, on their feet and on other parts of their bodies and that a part of that sick livestock died.

The expert testimony of the plaintiff tends to show that the sickness and death of his livestock was caused by having drank water in the river while there was fuel oil on it.

The defendants, with experimental and expert evidence tried to show that fuel oil is a substance which is harmless to animals. To this effect Dr. Jaime Bagué whose profession is veterinary, testified as to the habit of bovine and equine livestock of not drinking water that may smell bad or which may contain any strange matter in the nature of fuel oil and reached the conclusion that the livestock of the complainant did not drink the water from the Santiago River when it had the oil in question. To show that the fuel oil is not toxic he referred to an experiment which he made for the defendants with an ox and with the cooperation of the chemist, Mr. Pesquera, and in the presence of the attorneys for the defendants.

The other expert of the defendants, Mr. Angel M. Pesquera, a chemist by profession, explained the experiment to which Dr. Bagué referred in more detail and also made an experiment with guinea pigs and fishes in the presence of the court to show that fuel oil is completely inoffensive and that it could not have been the cause of the sickness and death of the complainant's livestock.

We are not going to explain these experiments in detail. Suffice it to say that the experiment made in the presence of the court with all kinds of guarantees for the complainant, showed conclusively that the fuel oil imbibed by the guinea pigs and that spilled in the fish tanks did no harm whatsoever to the animals, proving thereby that the substance used in the experiment, that is, fuel oil which The Shell Co. (P.R.) Ltd. sold at the date of the trial, November 1935, was completely inoffensive.

The same result was had in the experiment which Dr. Bagué and Mr. Pesquera carried out with the oxen. According to Dr. Bagué, he made one ox alone swallow one gallon of the same fuel oil used in the experiment in court and it had no effect whatsoever in the health of the animal.

Also, in the presence of the court and the parties represented by their respective attorneys on December 23, 1935,

the experiment was repeated with three oxen belonging to a farm in the Ward Sabana Seca of Toa Baja by giving to each of them at 11:30 of said day thirty-two ounces of the same fuel oil that had been used in court. At 1:30 of the same day, the court examined them again and found nothing strange to be observed and that they were eating. On 10:00 A.M. of the following day the court again went to Sabana Seca and observed that the external appearance of the three oxen was normal, that they were eating and their feces were completely normal. They then brought the animals close to two tanks of water in one of which an amount of fuel oil had been spilt. The animals had not drank since the previous day in the afternoon as stated by the court. One of them approached the tank where the fuel oil had been spilt and did not drink from it, whereupon the experiment was terminated. (T. of E. 1095–1098.)

On April 30, 1936, the court again went to Sabana Seca and after identifying the oxen which had been the subject of the experiment, one bronze color and marked 501, another dark yellow number 73 and another black, number 89, the court observed that they were in appearance in perfect health, without having suffered any disturbance whatsoever in their organism. (T. of E. 1101.)

If no other evidence had been adduced after the experiments performed by the defendant' experts, notwithstanding all the concurrent circumstances, we would be forced to conclude that the fuel oil could not have been either the direct or indirect cause of the sickness and death of the livestock; but the complainant again brought the expert, Mr. del Valle Sárraga, as rebuttal evidence and his testimony tends to destroy the effect of the experiments carried out by the defendants. Mr. del Valle testified that the fuel oil that The Shell Co. (P.R.) Ltd. sold in 1930 was not the same product as that sold on the date of the trial in this case (1935) under the same name and which was used in the experiments in question. Upheld by the work "A Petroleum Handbook

compiled by members of the Royal Dutch Shell Group", page 100, which was written by a group of engineers and chemists specialists in fuel oil and used, according to the witness and not contradicted by the opposing party, in the stations of The Shell Co., he stated that the fuel oil sold by The Shell Co. in 1935 was not toxic because the gasoline was then submitted to a certain process which is called in the work "cracking process" by means of which the toxic matters contained in the oil which was sold on or about the year 1930 are eliminated.

The defendants alleged that the rebuttal evidence of the witness Del Valle was not admissible because it was based on the book and not on the personal knowledge of the witness and that that book would not have been admitted in evidence because it was not written by responsible authors since their names did not appear on the book.

In our opinion, the lower court did not commit any error whatsoever in admitting the testimony of Mr. Del Valle. This witness testified as an expert and it is not necessary that an expert always testify on personal knowledge. He may base his testimony on the experience of others or on works about the subject which he has read or studied. 2 Jones on Evidence (1938 ed.) page 687, *et seq.* As to the weight of scientific works, Wigmore states:

"It must be admitted that those who write with no view to litigation are at least as trustworthy, though unsworn and unexamined, as perhaps the greater portion of those who take the stand for a fee from one of the litigants" 3 Wigmore on Evidence, (2nd ed.) p. 640.

See also what the same author says as to the admissibility in evidence of commercial or professional registries; lists and reports. Same work, volume 3, page 652.

Having stated all the evidence which the lower court had before it with the exception of that relating to the amount of the damages which will be considered in due time, we will first discuss the errors alleged by the defendants-appellants, although not in the order alleged.

■ The fourth alleged error states as follows:

4. The court erred in dismissing the motion for non-suit of the defendants.''

When the plaintiff had presented all his evidence, the defendant, Manuel Sierra Rodríguez, made a motion for a non-suit which was denied. The same is true of a like motion which was immediately made by the defendant, Plazuela Sugar Co. (T. of E. 644–647).

We cannot understand on what basis the lower court rendered the judgment against the defendant, Manuel Sierra Rodríguez. Not even from the evidence of the plaintiff himself does there appear the slightest proof of any act of negligence on the part of Manuel Sierra Rodríguez. We have seen that this defendant was a simple employee of the Central Los Caños; that he acted as chief mechanic and that his acts in this case were limited to correcting the defect of the wagon tank of the defendant, The Shell Co. (P.R.) Ltd. upon being called by the other mechanic, Manuel Sierra Sánchez. He was not bound to recover the spilt oil because that was not a part of his duties as appears from the evidence of the plaintiff himself. Therefore, the lower court erred in not granting the defendant's motion for non-suit.

■ We cannot agree, however, with the defendants-appellants in that the denial of the motion for non-suit of the Plazuela Sugar Co. was error, as we shall see in considering its alleged errors numbers 1, 2, 5 and 6, which we will now discuss.

As an appeal is taken against a judgment and not the holdings or findings which serve as the basis for it (González v. Vilella, 24 P.R.R. 262; Filardi v. Barreda, 24 P.R.R. 366; Berio v. American R.R. Co., 24 P.R.R. 384; Alcaide v. Morales, 26 P.R.R. 209; Avilés v. Sons of Rafael Toro, Ltd., 27 P.R.R. 616), let us see if the evidence presented justifies a judgment in favor of the plaintiff.

That the plaintiff was caused damages by the fuel oil carried by the river is a fact which admits of no discussion.

The question to be decided is who is bound to pay for it. Section 1802 of the Civil Code states that: ''A person who by an act or omission causes damage to another when there is fault or negligence shall be obliged to repair the damage so done.'' But it is fundamental in regard to negligence that there is a cause of action only when the negligence has been the proximate cause of the damages. Based on these legal principles, the defendants argue that even if they had been guilty of negligence, this was not the proximate cause of the damages which the plaintiff alleges he suffered, since the direct cause of the damages was the intervention of an independent agent which if it had not intervened would have caused no damage.

It is unquestionable that the defendant, The Shell Co. (P.R.) Ltd. was guilty of negligence in not shutting the valve of the wagon tank, since it should have foreseen that upon removing the cap of the wagon to connect it with the piping to empty the oil in the tank or deposit of the factory if the valve was not closed the fuel oil must necessarily spill. But was that negligence the proximate cause of the accident? Could this defendant foresee the fact that his negligence would produce damages such as those caused to the plaintiff? All that it could foresee was that on removing the cap, the oil would be spilled but not that it would be permitted to fall into a river from whose waters another person's livestock would drink. In this regard Bohlen & Harper on ''Torts'', page 258, Section 111, says:

''The first and best known test for proximate or legal cause is the test of foreseeability. Where the particular harm sustained was reasonably foreseeable at the time of the defendant's misconduct, his act or omission is the legal cause thereof. This rule is enunciated in many cases. Foreseeability, it will be recalled, is the fundamental basis of the law of negligence. To be negligent, a defendant must have acted or failed to act in such a way that an ordinary reasonable man would have realized that certain persons were unreasonably subjected to a general but definite class of risks. Now if the harm which has actually occurred is one of the particular risks which made the

actor's conduct negligent, it is obviously a consequence for which the actor must be held legally responsible. Otherwise, the legal duty is entirely defeated. Accordingly, the generalization may be formulated that all particular consequences, that is, consequences which occur in a manner which was reasonably foreseeable by the defendant at the time of his misconduct, are legally caused by such breach of duty.''

As an illustration we will refer to the case of *John Wanamaker* (*N.Y.*) *Inc.*, v. *Otis Elevator Co.* (N.Y., 1920), 126 N.E. 721. The Otis Elevator Co. constructed, sold and installed an elevator in the store owned by the Wanamaker Co. of New York. A client of the store, while using the elevator suffered personal damages when certain cables that held the elevator broke. In a *dictum*, the court said that the client could have claimed compensation not only from Wanamaker Company but also from The Otis Elevator Co. jointly or from either of the two separately. In that case, the damages suffered by the client could have been foreseen by The Elevator Co. since it had to know that if the cables that held the elevator broke, in all probability the persons occupying the elevator at the time of the accident would suffer damages. The damages could have been reasonably foreseen and were at the same time a natural and logical consequence of the negligent act. See also *MacPherson* v. *Buick Motor Co.*, 217 N.Y. 382.

In our opinion the act of the defendant Shell Company (P.R.) Ltd. in the present case was merely a condition under which the negligent act of the other defendant took place and which, as we shall see later, was the proximate cause of the damages suffered by the plaintiff. When the fuel oil spilled from the wagon tank to the ground the defendant, Plazuela Sugar Co. should have reasonably foreseen that if it did not stop it, it would run to the rivulet and from there to the Santiago River, that the waters at that river were or could be used by the riparian proprietors and by other people in different ways among which was the watering of

livestock and that the waters being contaminated by the oil might cause the damage which they did cause. Under these circumstances it was the legal duty of the defendant to stop the oil from reaching the river and, assuming that it was impossible, to take the necessary steps to warn those who could reasonably be expected to use the waters.

The defendant Plazuela Sugar Co. argues that it is not legally liable for the damages caused to the plaintiff and that its negligence, if any existed, was not the proximate cause of the accident, since an independent agent intervened without whose intervention the plaintiff would have suffered no damage whatsoever.

To uphold the theory that the damages caused to another are the result of the intervention of an independent agent, it is a requisite *sine qua non* that at the time the force which caused the damages was loosened, the independent agent had no existence or if it did exist, that it be ignored by the defendant and that he could not reasonably foresee it, since if it existed, and was known by the defendant, or even though not known could have been reasonably foreseen, then the supposed independent agent is no more nor less than a fact or circumstance that the defendant should have had in mind in acting or refusing to act in the manner that he did. Bohlen & Harper on Torts, 262, 270 (Sec. 119). To the same effect, see the article by Professor James Angell McLaughlin entitled ''Proximate Cause'' and published in 39 Harvard Law Review 149, 159.

Therefore it could not be sustained that the Santiago River was an independent agent without whose intervention no damage would have been caused.

That the fuel oil imbibed by the livestock was toxic was sufficiently proven by a preponderance of the evidence. This is proven by the concurrence of the following circumstances. The coincidence of the sickness of the livestock of the plaintiff in considerable numbers, bovine as well as equine,

with the existence of oil stains on the surface of the river where they watered; that at the same time the livestock of the witness, José Colón, became sick and presented identical symptoms to those presented by the livestock of the plaintiff after it had watered in the same river; the experiment carried out by the chemist, Mr. Del Valle, and finally the statements contained in the work "A Petroleum Handbook Compiled by Members of the Royal Dutch Shell Group", to which the chemist Del Valle, referred in his rebuttal testimony.

It is true that no witness saw the livestock of the plaintiff watering; but this is a fact that does not have to be proven by direct evidence. From the uncontroverted evidence of the plaintiff it appears that for some time the livestock was pasturing in the aforesaid farm of the plaintiff and as it is known that livestock waters daily and as the river was the only place where they drank, it must be concluded that the livestock drank as it accustomed in the place where it did so every day, as is indicated by the fact that they had oil stains on their legs and muzzles. It was not proven that before that date, oil had been spilt on the river and that the livestock of the plaintiff had suffered the same or a like sickness, nor that it had taken any other substance or food different from its customary food. In farms such as that of the plaintiff used to pasture livestock, there is generally no toxic grass, since care is taken as soon as any is discovered to uproot it immediately; but assuming that on that date some grass of this kind had grown, the natural thing would have been that not so many of the livestock should eat it and it would also have been a strange coincidence that the livestock of José Colón, on a different farm, some distance from that of the plaintiff, should have eaten at the same time of the same grass. If litigants should have to prove their cases with mathematical exactitude, in rare cases could justice be done. It is for this reason

that the Law of Evidence in its Section 4 (Code Civil Procedure, 1933 ed., Section 366) provides:

"The law does not require demonstration; that is, such a degree of proof as, excluding possibility of error, produces absolute certainty; because such proof is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind."

See also *P. R. Fruit Exchange* v. *Caul*, 35 P.R.R. 478.

 It is true that in its opinion, the lower court stated as follows:

"There is expert testimony in the record in regard to the toxic effect of the fuel oil and from the record also appears the experiments made in our presence on fish and those made with three oxen on a farm in Toa Baja. In reality, to judge by this experiment, we cannot determine if the *fuel oil imbibed by the oxen which were used in our experiment* is a toxic substance; in good logic we must conclude that it is not; but there is nothing to exclude the possibility that said substance may cause the death of the small fishes and that these may contaminate the waters of the river making it improper for animals and causing them sickness and even death. *The fact is that evidence of the plaintiff in regard to the loss of livestock has not been contradicted.*" (Judgment Roll, page 39.) (Italics ours).

We agree with the defendants-appellants in that the lower court erred in basing its conclusions on a theory distinct from that set forth in the complaint and in the bill of particulars; but as there exists sufficient evidence in the record to hold that the cause of the poisoning was that alleged in the complaint and in the bill of particulars, that is, the fact that the livestock imbibed the fuel oil while watering, the error of the court in weighing the evidence cannot produce the reversal of the judgment nor does it prejudice the plaintiff. It is convenient to observe that the court does not decide that the oil imbibed by the livestock of the plaintiff was not toxic. What the court held was that the fuel oil imbibed by *the oxen which served as examples in the experiment of the defendants* was not a toxic substance, and with this we agree.

 Let us now consider the third and fourth assignments of error and leave the seventh which refers to the amount of damages to be studied in considering the appeal filed by the plaintiff.

The fact whether the plaintiff was the owner or only the lessee of the lands mentioned in the complaint, is completely immaterial to the questions in controversy, since damages to the property are not claimed but to the livestock belonging to the plaintiff. Therefore, it is not necessary to consider whether the land where the livestock pastured belonged to the plaintiff or whether he held it under lease. The legal effect of this discrepancy between the averments of the complaint and the bill of particulars, is to amend the former to state that the farms are situated in the wards mentioned in the bill of particulars, and the evidence of the plaintiff should, as was done in the present case, limit itself to the specifications in the bill of particulars. See 21 R.C.L. 480 *et seq.; Anderson* v. *Rucker Bros.*, 8. A.L.R. 544 and the note which follows; *Bloom* v. *Nathan Vehon Co.*, 72 A.L.R. 232. Therefore, the lower court correctly allowed the plaintiff and his witnesses to refer to the farms possessed by the plaintiff as situated in the wards of Hato Abajo and Hato Arriba of Arecibo.

 As we said when we mentioned the offering in evidence of the notarial act referring to the taking of samples of fuel oil, the defendants alleged that such evidence was not admissible since its admission took from them their right to cross-examine the notary in regard to the facts certified by him. This question was not raised in the assignment of error of the defendant nor mentioned in any part of their brief, which authorizes us to consider it waived. But as the notarial act is the basis of the expert information of Mr. Del Valle Sárraga since the sample taken, certified and sent by the notary was the one used by the expert in his study which brought him to the conclusion that the fuel oil was

toxic, we think it convenient to study the admissibility of that evidence.

If the document involved was one subscribed to by a particular person or by any other officer who had not taken the notarial oath, we would have to accept the contention of the defendants-appellants. But a notarial act is involved, executed with all the legal solemnities; and our law credits all manifestations made by notaries based on their personal observations or acts carried out by them, unless the person who impugns them proves their falsity satisfactorily.

The well known author Miguel Fernández Casado, in his work entitled *"Tratado de Notaría"*, Vol. 1, page 395, Section 448, gives us the following definition of a notarial act:

"A notarial act is a public instrument containing an exact statement of a fact *which may decide the rights of parties* and which is made at the request of another person." (Italics ours).

Referring to the weight in evidence of a notarial act, said author says:

"The law affords a notarial certificate complete credibility as evidence and the document acquires a presumption of truth." Work cited, page 583.

Further illustrating the act or observations which may be the object of a notarial act, the same author states as follows:

"The notary public certifies in the notarial act as to certain actions of the appearing party, of third persons or certifies as to certain physical phenomena which may be noted by him through the senses —especially those of hearing and sight—and by the knowledge of everyday happenings. The delivery of a letter by the client, the entrance of another person into certain premises or his departure therefrom; the interment or exhumation of a body; the time marked by the clock at a certain given moment; the fact that a door is opened or closed at a certain time are examples *of the facts which may be certified to in a notarial act."* Volume 1, page 584. (Italics ours).

This faculty or privilege of the notary is found in our Notarial Law approved on March 8, 1906, and therefore later

than Section 1 of the Law of Evidence (Compiled Statutes 1911, Section 1979), which states:

"Notaries are the only officials authorized to certify contracts *and other extrajudicial instruments that are executed in their presence* in accordance with the law."

It is obvious that the *"extrajudicial instruments that are executed in their presence"* to which the legal provision above quoted refers, are of the same kind as those which Fernández Casado illustrates in the above citation to which may be added the manifestations and acts made by the notary himself and which are the object of the notarial act herein involved.

In harmony with our Notarial Law, the Civil Code (1930 ed.) in its Section 1172, which is the same as Section 1218 of the Spanish Civil Code, in its pertinent part states as follows:

"Public instruments are evidence, even against a third person, *of the fact which gave rise to their execution and of the date of the latter.*
" * * * * * * * "

In a commentary of Section 1218 of the Spanish Civil Code, Manresa states as follows:

"Once it is determined who must be considered a third party, the provision of Section 1218 leaves no room for doubt: the public deed, the public document in general, *is complete proof, even against that third party, unless the falsity of the act that the notary sees and to which he certifies, or the date of the document, is proven; but it is not as to the veracity of the statements made in the document by the appearing party.*"

" A consequence of this is the slight worth of notarial acts *wherein the notary limits himself to certify that certain persons have issued a statement in his presence, since this statement, the only purpose of the document, does not acquire, by being expressed therein, the force of documentary proof, but keeps its own nature of mere testimony, inferior indeed to the testimony of witnesses,* since it does not have the guarantee of the oath and lacks the intervention of the parties,

who may be prejudiced by what is expressed in the act." Manresa, *Comentarios al Código Civil,* 1907 ed., Vol. 8, page 465. (Italics ours.)

Summarizing, a notarial act which, as in the present case, certifies as to what the notary saw and did, is *sufficient proof even against third parties* of the facts seen or done by the notary as well as of the date of the document. Of course, in deeds where the notary certifies the manifestations made before him by the executing parties and witnesses, the notary does not certify nor has he any authority to certify as to the exactness of said manifestations. He only certifies, and as to this, his certificate is full evidence that the executing parties and the witnesses made the statements before him which are included in the document. The statements may be true or false and they bind and are proof only as between the parties who made them.

In our opinion, as in this case a notarial act is involved in which the notary certifies to acts done and observations made by him as a notary, the lower court committed no error in admitting the evidence offered by the plaintiff.

Let us now consider the errors numbers one and two assigned by the plaintiff and the seventh of the defendants, or that is, let us decide the amount of the damages which the plaintiff alleges he suffered.

The lower court in its opinion, after refusing to consider certain items of damages claimed by the plaintiff, such as $8,000 to which we shall refer later on, and the item for the hiring of oxen to finish the collection of the crop, calculates that the damages suffered by the plaintiff amount to $3,000, although we cannot determine what factors it took into consideration in reaching this conclusion.

The defendants presented in evidence certified copies of the declarations of ownership of property filed in The Treasury Department by the plaintiff for the years 1929-30 and 1930-31 (T. of E. 1005 and 1089-1092 both inclusive), from which it appears that the plaintiff did not declare any

livestock whatsoever. In our opinion, this evidence is not conclusive and cannot go against the true state of affairs, it appearing as it does appear from the evidence that the plaintiff possessed bovine as well as equine livestock. If in order to estimate the damages, we have to depend upon the testimony of the plaintiff in regard to the number of livestock the defendant must blame itself since it could have examined it opportunely when notified by the plaintiff on that day that he discovered the sickness and did not do so, thereby showing that it had no interest whatsoever in the loss that the plaintiff then alleged. Among the items claimed by the plaintiff is one for $8,000 for *"other losses and disorder in his business and loss of credit"* which was refused in its entirety by the lower court. As the plaintiff agrees with the decision of the lower court in this regard (brief for appellant, pages 8–10) we will not stop to consider it, accepting the conclusion of the lower court.

We will consider in the first place the damages caused to the plaintiff by the death of the nine head of equine livestock, to wit: (1) a full blooded mare called "Ponce First"; (2) an offspring of the mare Ponce First and Marqués de la Plata, two months of age; (3) a mare, Usera, (not full blooded); (4) an offspring of the mare Usera and Marqués de la Plata, two months old; (5) a mare, Maruca, about to give birth, covered by Marqués de la Plata; (6) offspring of Malvaloca (not full blooded) by Marqués de la Plata; (7) filly Liberty (not full blooded); (8) mare Ruiz Soler (full blooded); (9) offspring of the mare Ruiz Soler by Marqués de la Plata, two months old.

From the evidence of the plaintiff it appeared that these animals were fed on pasture and did not eat oats or any other concentrated foods.

According to the expert of the plaintiff these animals had a minimum value of $5,950.00, assessed as follows: No. 1, $300; No. 2, $900; No. 3, $150; No. 4, $200; No. 5, $800; No. 6, $1,200; No. 7, $1,200; No. 8, $200; No. 9, $1,000.

The expert of the defendants testified without been contradicted, that a horse which has been bred without concentrated foods, has no value whatsoever as a race horse, since the specialty to which these animals are devoted require that from the time they are in their mother's womb they be well fed so that they will be born and grow strong and vigorous and thereby may be able to resist the strong trials which they later undergo in the race-tracks. The expert maintained that from the time the mare is covered, it is given concentrated foods and that a colt a year old eats ten pounds of oats a day distributed in three meals. Considering that the livestock of the plaintiff only ate natural pasture, he valued the two months old colts at $50 each, assuring that they were worthless as race horses and the full blooded mares he valued, although covered, at not more than $300 each.

From the study that we have made of the expert testimony in regard to this livestock, we are of the opinion that the loss suffered by the plaintiff by the death of these nine head of equine livestock may be reasonably and justly assessed in the amount of $1,300 as follows: No. 1, $300; No. 2, $50; No. 3, $100; No. 4, $50; No. 5, $200; No. 6, $50; No. 7, $200; No. 8, $300; No. 9, $50. (The same order in which they are named above is followed.)

The plaintiff estimated the loss of the 35 work oxen at $3,200, that is, at $91.42 each ox. This estimate of the plaintiff is undoubtedly excessive. The defendants did not present any evidence as to the value of the bovine livestock, but we are not bound to accept blindly the valuation given by the plaintiff. The 35 oxen are equivalent to seventeen and a half pairs. Calculating an average of $140 per pair or $70 for each ox, the reasonable value of the 35 oxen is $2,450.

The plaintiff, according to his testimony not contradicted by the defendants lost twenty-one cows which he valued at $2,500. According to the plaintiff, these cows were dry. (T. of E. 273.) It was not proven that they were full blooded livestock nor does any evidence exist as to their

age or the number of calves which they had dropped and the plaintiff should have, in presenting his evidence, given sufficient data to be able to reasonably calculate their value. Valuing these cows at $70 each, their total value would be $1,470.

The plaintiff also lost eight heifers which he valued at $300, five steers which he valued at $240 and seventeen calves which he valued at $136. There existing no reason to deny these valuations, we accept them as reasonable thereby raising the amount of the loss of the bovine livestock to the amount of $4,596.

The item of $648 claimed by the plaintiff as paid by him to Mr. Correa for the lease of oxen to finish the collection of the crop was denied by the lower court because it held that said oxen were hired from the month of November 1929, according to the testimony of Correa, that is, five months before the livestock was poisoned and that therefore, the necessity of this expense could not be attributed to happenings occurring later, on March 1930.

In our opinion, we must not alter the result arrived at by the lower court in denying this item, for since the oxen died and the defendants were ordered to return their value to the plaintiff, he could not in addition to the value, recover compensation for the loss of the services of said oxen. *Rodríguez v. Martínez,* 55 P.R.R. 56.

The evidence in regard to the item of $478.83 due to the delay in growth of the sick livestock which lived does not convince us, nor that relative to the expenses for the care of the livestock, since from the evidence of the plaintiff it only appears that he bought some medicines in the drug store which consisted of sulphate of soda, calcined magnesia, cream of bismuth, flax seed, castille soap and tincture of opium (T. of E. 1077, 1078) but it was not proven what amount he bought of said medicines, the price he paid for them nor what payments he made to the *peones* which according to him took care of the livestock. The foregoing brings

us to the conclusion that the damages suffered by the plaintiff caused by the negligence of the defendant, Plazuela Sugar Co. amount to $5,896, that is, $1,300 for the loss of the horses; $2,450 for that of the oxen; $1,470 for the loss of cows and $300, $240 and $136 for the loss of the heifers, steers and calves respectively.

Considering now the third assignment of error assigned by plaintiff which refers to the fact that the lower court did not condemn the defendants to pay attorney's fees, we agree with the plaintiff that the lower court did not use well its discretion in not awarding the plaintiff attorney's fees since from the evidence it appears that the defendant Plazuela Sugar Co. was stubborn in its defense of the suit. If instead of being indifferent to the losses alleged by the plaintiff, the defendants had examined the livestock and ascertained the damages really suffered by the plaintiff, in all probability they would have reached an agreement in regard to the amount of the damages and the plaintiff would not have had to file this suit which has undoubtedly caused him considerable expenses.

For the foregoing reasons, the appeal of the defendants in case No. 7884, filed against the decision of the lower court approving the statement of the case submitted by the plaintiff should be dismissed as academic. The appeals filed by Manuel Sierra Rodríguez and The Shell Co. (P.R.) Ltd. in the case No. 7720 should be granted, and the judgment rendered against said defendants should be reversed; the appeal filed by The Plazuela Sugar Co. in the said case No. 7720 should be dismissed and the judgment against the plaintiff in case No. 7721 appealed, should be modified condemning the Plazuela Sugar Co. to pay him the amount of $5,896.00 plus costs and $500.00 as attorney's fees and so modified, the judgment should be affirmed.

Mr. Justice Wolf agrees with the result.